The next case, please. Good morning. My name is Rikuli, of course, and I'm here to representing Mrs Sharbono, who was a breast cancer victim. And we believe that the trial court caused sufficient error to result in a jury verdict for the defendants in the case. And a comment that I'd like to make is that the record is significant and voluminous, and there just wasn't enough dialogue between the attorneys and the witnesses to essentially give you a real look at what went on in the trial court. I assume, however, you will look at the record and you will understand that my brief obviously couldn't cover that. But let's start out with the case itself. The case is as a result of Mrs Sharbono having a mammogram at the St. Mary's Hospital by the defendant Hilborn. She had had a mammogram approximately four, five, or six years prior at the age of 33 in the state of Texas. At that time, there was a baseline mammogram, and it The mammogram that she had when she was 33 years old was not necessarily for any complaints that she had about her breast, but was an overall part of an overall physical examination. That's important because of what will come next down the road when I get into my argument. Subsequently, she moved back to Streeter from Texas. And as a result, in 2004, some six years later, five or six years later, at the age of about 38, she made some complaints, overall complaints to her family doctor, Dr. Chacko. And Dr. Chacko recommended that she have an examination, laboratory testing, and also suggested that she have a mammogram. She had the mammogram. The mammogram was sufficiently concerning to the radiologist that he wanted to see the mammogram that was originally taken in Texas some five or six years earlier. When that came back, the screening mammogram, which was taken in Streeter, Illinois in 2004, was compared with the one that was taken six years earlier, and there seemed to be an asymmetric problem, which is a concerning problem for the radiologist. And he decided that because of that, he wanted to do a diagnostic mammogram. So they called her back after approximately four or five days. She had a spot or a diagnostic mammogram, and he still wasn't satisfied with the results of that mammogram. So he decided that he should do an ultrasound. The ultrasound was performed. After the ultrasound, he relayed the information to the plaintiff that everything was fine. There was no problems. It was a benign result. Come back. This is his testimony is that he told her to come back in a year. Subsequently, a letter was sent from the hospital, which letter was signed by Dr. with the rules of the American Cancer Society and have annual tests, mammograms at the age of 40. Everybody in this record will agree that while it was a late 40, she had the mammogram that resulted in cancer in 2006 when she went in for that annual mammogram. What is important here is that's the fact. She had problems between 2005 and 2006. She went to Dr. Chacko, her family doctor. She sent her to the hospital for another mammogram, which was delayed by four or five months because Dr. Chacko, the evidence shows, didn't make the appointment for her, and St. Mary's will not take you unless you get an appointment from a doctor. She couldn't make the appointment herself. So she started in May of 2006 to attempt to get this mammogram, and then actually it 2006, which is now the third mammogram. She had the one in Texas, the one in 2004, and now this one in 2006. That one was evaluated by the radiologist as malignant. He did all of the tests. He did the screening, the diagnostic, the ultrasound, did a biopsy, and it was malignant. It's also in the record that the malignancy, the tissue that was biopsied, was in the exact same location as what was earlier called by the radiologist as a fibroadema, some sort of a fibrocyst that he said was non-cancerous. That is kind of a general statement as to where we're at in terms of the facts of the case. What's The plaintiff filed all of the usual discovery vehicles, the 213 interrogatories, 214 requests to produce, motions in limine, everything seeking to have from the defendant everything that they had in terms of journals, texts, photographs, the standard of what is usually the object of the discovery vehicles. The trial started and we began the trial, and when the plaintiff's case was, well, actually the way the case was tried, we agreed to put the defendant on the stand during the plaintiff's case in chief, which is done many times, to avoid having to call the defense again in the case, in the defense case. So the plaintiff called the defendant, in his case as an adverse witness. There was an agreement that we would allow the defense to go into what he would normally go into as far as testimony is concerned within the adverse testimony in order to shorten the process. When the defendant took the stand, subsequent to my examination, the plaintiff put on, or the defendant put on, a PowerPoint exhibit, which is one of the major points of why we believe this case should be reversed. That PowerPoint exhibit violated about four portions of the rules of evidence and discovery. First of all, it was never provided us before the trial. Secondly, it contained hearsay. And thirdly, it was the mammogram films that Dr. Hilborn took of the plaintiff in 2004 when he determined she had no cancer, but it was benign. Now, let me get to that. This PowerPoint was a reproduction from a textbook, which was also never disclosed. We asked about textbooks. We didn't get a disclosure. The textbook had actual mammograms as a teaching instrument to teach those who used that textbook as to what cancer looked like or could look like, what a benign mass looked like. Those were reproduced in this PowerPoint, and they were labeled cancer non-cancerous, and they were put on a screen. We objected vehemently right at the start. We objected on the basis that this was never disclosed to us. We had no opportunity to know that this was coming, and we cited the cases that we had. The case, especially the case that involved the photograph of the parking lot and the car, where the judge ruled that the photograph of the car could come in, even though it wasn't disclosed, because it was not moved. It didn't have any real relevance to how the accident happened, but he would not allow the substantive nature of the case. In any event, what our complaint about the PowerPoint was that there was radiologists that read the reproductions that were put in the textbook that were reproduced for the jury. They read those as either cancerous or non-cancerous. Unknown radiologists. Therefore, what happened, even in just that situation, what we had was additional experts that they were able to argue to the jury in comparing what those experts' opinion was on the reproductive copies of the mammograms with the mammograms that were taken in 2006, which, or in 2004, which were deemed to be benign by the radiologist defendant. We had no basis. We couldn't cross-examine, obviously. We don't, there was no way we could cross-examine those radiologists. They came from a textbook that was never disclosed. It's hearsay, double hearsay, because Hilborn testified that that particular reproduction was, in fact, a cancer or a non-cancer, and now used that, Mr. and Mrs. Jury, to compare it with my mammogram of 2004. And you will note the similarities and the distinctions. So as to persuade the jury that his 2004 evaluation compared with the reproduction that was evaluated by other radiologists. So you have hearsay, you have a situation that left us without any opportunity to rebut that particular testimony. With regard to the, to that exhibit, I guess they disclosed that to you before the trial, just before the trial started. There is a, no, we do not agree with that. Their position is they emailed it seven days before, and they did email. They emailed everything except the PowerPoint. The PowerPoint was never emailed to us. The disk that showed these photographs, that showed, that named the text, that was, we saw that for the first time. It's our position when they put it on the screen. Now, the doctor, with regard to the exhibits, that exhibit, the PowerPoint exhibit and presentation, when they went through these other examples of cancer and non-cancer, and that was all based on matters from textbook, a particular textbook. Yes. Now, the witness never deemed that textbook as authoritative. He did not. There was, thank you, there was never any testimony that that textbook was authoritative, and it also violated the rule that says you can't use a textbook in your direct examination of a witness, even if you have, even if it's deemed to be authoritative. You can only use it for cross-examination. Well, there's some debate about that sometimes. Well, I, most of the cases, your honor, that I saw suggested to me that those particular journals and the use of journals in direct examination of your own witness was prohibitive, prohibited, unless. I mean, what I'm referring to as a debate is in Wilson versus Clark, the witness doesn't, in the direct examination, if you're rendering an opinion, you can indicate what you're if you disclose it, but it was never disclosed. So we had nothing to come back with. Now, in their opinion, they're 213, they never disclosed that their expert was going to use those texts. Now, your position, if I understand it correctly, is, is he used, I mean, those, that example was used to form what essentially is an opinion from the witness, from the defendant witness. It was, his position is that it was not an opinion. It was just a demonstrative of other evidence that was coming in. Except for the contrast, except for the opinion of the radiologists that read the original mammogram that was reproduced in the textbook was presented to the jury. It was labeled. And it was labeled in the text as cancer, non-cancer. They refer to that as simply for copyright purposes, that was added. But your position is that was essentially an opinion from that. Absolutely. And keep in mind, judge, with ages were on the PowerPoint. That means that he must have spent at least an hour or an hour and a half on the PowerPoint. That's how important it was to the defense to bring in that particular PowerPoint presentation. But it was, as I said, there was hearsay, non-disclosure, we had no discovery. I think if there's ever a case that warrants a reversal because of lack of following the rules of discovery, the record will be replete with this being one of the cases. We just didn't get it. And we had motions eliminated. We had all kinds of motions and requests to produce that required them to give this information to us. And they didn't do it. I want to move on. I want to move on to there's a BI-RADS situation that's very important. Everybody agrees that the BI-RADS is a guide for radiologists to evaluate mammograms. It goes from BI-RADS two and three are relevant to this case. Dr. Hilborn said this was a BI-RADS two, which means benign. Throughout the entire record, you will see that Dr. Hilborn, when asked the question as to whether or not his mammograms in 2004 were cancerous or non-cancerous or to evaluate them, he said they were probably benign. Probably benign is a BI-RADS three, not a BI-RADS two. And it's in the record. And in fact, I believe it'll suggest to you that BI-RADS two has no precondition. It's benign. BI-RADS three is probably benign, requiring a short return of the patient within three to six months so that the patient then has a determination as to at least knowledge that the probably no longer is a probably. Either you have cancer or you don't have cancer. These ladies are entitled to know if they have cancer or they don't have cancer. And that's why the BI-RADS are used by every radiologist. And they have conditions on each of the BI-RADS categories as to bringing them back or telling them they don't need to come for a look at the record on that. The colloquy between me and Hilborn and their two experts is very revealing. Every one of their answers to me and to Mr. Hickey, the defense lawyer was probably benign, more probably benign. Not one answer came back and said benign, which is what a BI-RADS two is. And a BI-RADS three is probably benign, which requires and is conditioned on a return. One other thing I want to mention before I have to leave here is the judge ruled there was no contributory negligence. Yet, over objections, he gave a mitigation instruction. There was no mitigation. If you look at the cases I cited, mitigation is entirely different. She didn't do anything to cause herself to have cancer. I mean, there was nothing in this record that says she caused herself to have cancer. This type of condition doesn't call for mitigation. Yet, he allowed that mitigation instruction to be used. And that instruction was, as a result, a tool used by the defendant arguing to the jury that she didn't come back for over a year and it was her fault. She didn't come back for over a year. Had she come back, they would have found the cancer. And as a result, when you put that together with everything else, this lady did not get a fair trial. And besides which, your honor, there's even other issues involved that I don't have time to hit on. But if you look at the cases, the Scales case, the Jackson case, one of the cases that I cited in there was that the court would not allow a mother who was suing for a retarded son to bring the son into the courtroom for the jury to see the son because she didn't disclose the son on a discovery response. Another one of those cases were a bumper to show the damages of a car. The judge refused to allow the bumper to be brought in because it wasn't disclosed to the other side. I want to ask one last question and that's dealing with the jury instruction. They say there's an argument that the law was in a state of flux at the time and there was a criticism by the Supreme Court of the one instruction and the language used in the instruction, although that didn't justify a reversal in that case. Is that correct? Yes. And your position is what you set out in a it wasn't truly, when you have a close call, and I realize that that particular instruction was found not to have, was found invalid, it shouldn't have been given, or improper I should say, but that the Supreme Court ruled that it didn't impact. But when you have this case, when you have all of the elements involved in what happened in this case, and the rulings of the judge in this case, and then give that instruction, when you have the argument made by the defense about the expert witness, that instruction had a significant impact on the jury, in my And I think that at the very least, I think we should give the judgment to NOB because he did not comply with the standard of care in bringing her back within three to six months by his own admission. It was a BI-RADS 3, probably benign and not a BI-RADS 2. You know, I compare it to a giraffe and a camel. Now he calls this a BI-RADS 2, but it's a BI-RADS 3 definition. You can look at a giraffe and call it, or a camel, and call it a giraffe, and then describe what you And neither does a BI-RADS 2 have a probably benign. Thank you very much. Thank you Mr. Rickley. Mr. Hickey, good morning. Good morning. Good morning, your honors. Brian Hickey on behalf of Dr. Mark Kilborne. First, I'd just like to address the major issues of what plaintiff is requesting on this appeal, which is either a judgment notwithstanding a I don't believe there's any evidence in this record, in any of the briefs, to justify a JNOB first off, because there certainly is plenty of evidence that supports the jury's verdict in this case. And as everyone's familiar with the Pedrick standard, it's certainly not a case where the evidence so overwhelmingly favored the plaintiff that no contrary verdict based on the evidence could ever So if we focus on new trial, was there an abuse of discretion by Judge Heddle in this case? And there simply is not. This was a very clean two and a half week trial that Mr. Rickley and I participated in. Spent three days picking jurors, four a day. It was a slow, tedious process, but we did both believe that we had a fair jury, and I believe the conclusion also supports that we did have a fair jury in this case. There's a debate about Exhibit 18. Yes, I'm going right to that. And with regard to that exhibit, there's I guess a dispute about how soon you disclosed it or when you disclosed it. And another question is, the nondisclosed, I guess it was there was a nondisclosed use of material from a textbook that was used in the PowerPoint. And I take it your position is that that wasn't part of anything that was part of an opinion that was authoritative, yet the defendant doctor used that in rendering his comparisons. Correct. You're correct, Your Honor. Prior to trial, in pretrial meetings with Judge Heddle, we discussed the use of demonstrative exhibits. Judge Heddle entered an order that all demonstrative exhibits would be disclosed with the other party by whatever the certain date was. And in compliance with that, I had a discussion with Mr. Ricuvia's partner, Mr. McFedrin, and told him in addition to everything else that he has seen, we also do have a PowerPoint presentation. I then asked him for his email address, which he gave to me. I then emailed that PowerPoint presentation to him myself. So I personally provided that to him. The PowerPoint presentation contained basically a couple of different images. The different sets of images first included all of the, it included some of the mammogram images from the plaintiff. It included some of the ultrasound images of the plaintiff. And it also included some ultrasound images that we were intending to use as a demonstrative exhibit that were pulled from a textbook. Those images, since we pulled them from a textbook, we figured because of copyright laws, we had to attribute those images to the textbook. And a very tiny print that I submit was not even viewable by the jurors was on this PowerPoint presentation, which is just still pictures. Well, what was the purpose of the PowerPoint? The purpose of the PowerPoint was this case involved, basically the crux of the case was did Dr. Hilborn need, in order to meet the standard of care, need to perform a biopsy on a mass that he saw in this woman's left breast on a ultrasound imaging techniques, and based on the four main characteristics that you look for in an ultrasound, that this was probably a benign finding. And so the purpose of this PowerPoint was to show the jury the different issues that a radiologist looks for to make a determination that even if there is some mass seen, they still don't need to do a biopsy. And that's, if I can follow up on that, that's my question about this is certainly after Wilson versus Clark, you can use an authoritative treatise as a basis for your opinion, if you're rendering an opinion. And in Illinois, unlike the federal courts, it's not admitted as substantive evidence. But it is correct in this case that the other book was never declared to be authoritative by this witness. And at the same time, the comparisons were things that were cancerous and things that were non-cancerous in those textbooks, and that was the comparison. Is that an opinion in your, was that rendering an opinion from your standpoint? Because if you're taking those is a non-cancerous exhibit, and look at our things are more like this and not like that. Well, is that using that as an authoritative text for a rendering of opinion? I can tell you, Your Honor, that there was, I'm guessing approximately eight different textbook images that were used. Seven of them didn't have any and that was it. And when plaintiff's counsel objected to the use of this, we were very mindful of his ruling and made it very clear to the jury that what we're showing them from these images that are just used for demonstrative purposes, that we're not showing these for any purpose other than to educate the jury. So we made it very clear in our direct examination when pointing to any of the images from the textbooks that these are not this patient and these are not doing anything other than to establish how does a radiologist interpret these images. So we pointed out to the jury, despite the fact there was a label on one, we point out to the jury, this is not substantive evidence. This is just to try to educate you what a radiologist does. I understand that, but if it's comparing the two things, was there testimony that this appears to be cancerous and you can see how different this is from this patient's exhibit? Well, actually, not exactly because an ultrasound image alone cannot tell if something's cancer. All an ultrasound image can do is if you take these four images, it's either malignant or more likely benign. And the only way that you determine if something is cancerous is to do a biopsy and put a needle into that mass, take tissue out, and then send it to the pathologist for an evaluation. So there's nothing about the ultrasound images alone that can make a conclusion that this is cancer or not. Let me ask that question a different way. You got slides up here on your slide. We'd look at that and say that's not cancerous, and look at these things and say, by the way, here's the plaintiff's mammogram or ultrasound. You can see it looks more like this non-cancerous one. Does that happen? I don't believe it happened like that, Your Honor. I think that really you have to read the whole transcript of Dr. Hilborn's testimony where he is questioned about the PowerPoint. Well, how do you say it happened then? How is the comparison happening? The comparison is showing a textbook image and talking about margins. So first we talk about the shape of the mass. Is it regular? Is it irregular? If it's irregular, it's more likely to be malignant. If it's regular, it's more likely to be benign. Then we go to shadowing. Then we show an image where there's evidence of the mass and whether there's a shadow behind it. If there's a shadow, malignant. If no shadow, benign. Then we go to the axis of orientation, whether it's more lined up with a Y axis or an X axis. And then the fourth thing we would go to is something called internal echoconsistency, how well the sound of an ultrasound goes through the mass. So we go through each of these four characteristics with the demonstrative examples from the text. And then I put that aside and then I went to Ms. Charbonneau's case. And I went to her images and went through with Dr. Hilborn the margins. What's the shape of the margins in this case? You compared it to those other... Well, I didn't. I had it separate. I didn't have them side by side. I just put up her images and just talked to Dr. Hilborn. What do you see in the margins here? Are they regular or irregular? Then I showed another image on shadowing. Tell the jury what you see here in shadowing. And then at the conclusion, based on looking at her images, what did you the standard of care required me to do a biopsy? If they weren't compared, what was the relevancy of those other... Because I think the images that you see on an ultrasound, I think for all of us, make no sense at all. It's very grainy. It's black and white and gray. And it's like looking at a Rorschach test where you really can't tell what the heck a radiologist can tell from looking at these ultrasound images. And I just wanted to give another set of images other than just this one patient to show a little different view of what these images look like because the images are of a quality that a radiologist can appreciate, but I don't know that a jury can really understand what a radiologist... Were they described as cancerous or non-cancerous? There was only one image that was shown from a test that had a label that said malignant. Was there testimony with regard to cancerous and non-cancerous of those images? I think there was testimony by Dr. Hilborn on that one image at one time. Was there testimony that said this is a regular kind of margin and this is an irregular? Yes. Oh yeah, there was all kinds of testimony on margins. So he did make comparisons between the pictures from the textbook and the pictures from the point? I don't believe so. I think from the textbook he just explained the different characteristics of what he's looking for. And then when he made conclusions about what he found was based solely on Ms. Charbonneau's ultrasound images. Couldn't he have used just her images and used a pen or something and said, okay, this would be a regular margin and this is what these margins look like without using something presumably authoritative? I think that you are correct, you can. I just happen to think that in this case, those demonstrative examples helped the jury to understand what he was doing. The types of masses that you have, the shape of them, there's sometimes a classic shape where there's a lineup on an axis of orientation where it's like a big oval and it's really easy to see. Or you have a kind of a longitudinal shape. So there's certain masses in ultrasounds that are very easy to determine each of these four characteristics. But there's some shades of gray where the shape isn't quite lined up right. And I think it was a teaching tool for the jury to see a more classic example of a mass that lined up on an axis in a certain way. So the reason I'm asking these questions with regard to your style is demonstrative evidence. Typically demonstrative evidence is based on other evidence in the case. In this case, these other images don't come in except for this testimony. And typically when you're using, after Wilson v. Clark in Illinois, when you're using matters from a textbook, you deem them authoritative, at least the witness claims that they're authoritative, and we allow its use as the basis for that person's opinion. And here in this case, didn't this witness give opinions then, based on whether something's cancerous or non-cancerous? He didn't give an opinion whether something was cancerous or non-cancerous. All he did was... You mean of the plaintiffs, whether it was cancerous or cancerous? No, he only gave the opinion that more likely than not, a biopsy wasn't required by the standard of care because he felt more likely than not it wasn't cancerous. It was probably benign. Yeah, and he conceded it could have been cancerous. It was probably benign. Right, but it was probably benign, and I think all the testimony from our side was that there was, based on all of the characteristics in that ultrasound, there was a 98% chance of being benign. But there's always a 2% chance in that scenario that it was malignant. Is there a difference between a 2 and a 3? You know, according to my expert, Dr. Racenstein, he said that it's really a subjective decision by the radiologist whether it's a BI-RADS 2 or a BI-RADS 3. But I disagree with plaintiff's counsel when he says if it's a BI-RADS 3, then he admitted he deviated from the standard of care. That's not true. There's no authoritative article or text that was introduced in this case to indicate that this woman needed to be followed up in three to six months if it was a BI-RADS 3. That was the only testimony from Mr. Acuvia's expert, Dr. Foley, who said a short interval follow-up is three to six months. It was always the position that we had that the follow-up that was reasonable in this case, whether it was BI-RADS 2 or BI-RADS 3, was a one-year follow-up. On another topic, just briefly, with regard to the jury instruction, the Supreme Court has said that this one instruction is erroneous, right? The standard of care, the 105.01. So, what's your... Well, the Supreme Court had stated that the instruction at the time that was erroneous was the instruction that the plaintiff wanted to submit. So the instruction that we submitted was the 2005 version of reasonably well-qualified. So we basically fell into that gap period of time where there wasn't a clear direction on whether or not the IPI was going to be reasonably well-qualified or reasonably careful. And what's the position now? It's reasonably careful. And what the plaintiff submitted, their proposed instruction, was a reasonably careful and well-qualified. So they combined both together, and we know that's not what the law is today. And you provided... We provided a reasonably well-qualified standard, the one that was used in 2005 and prior for many, many years. But today it's not? Correct. So does that make a difference? I don't think it makes any difference at all. Is this determined now that that should be a different instruction now? Now the court's used reasonably careful under similar circumstances. The IPI at the time was missing that language that the stud court determined was an erroneous statement of the law. And the obvious reason why I'm asking this question is, it's not like it's some change, it's decisions on whether something's the proper standard or not the proper standard. And it's been the proper standard or not the proper standard for some time. It just takes a while before a case comes out about it. Correct? Correct. So neither 2005 nor 2006 instruction is the correct one? As the current law stands, I'd agree with that. But at the time, I think that the 2005 instruction was appropriate. I don't think the jury was misled as to what they were determining. I think that reasonably well-qualified had been used for at least a decade or two before the IPI committee decided to change it to reasonably careful in 2006. And that's what you're telling me is erroneous? Correct. Any further questions? Thank you, Mr. Gould. One more minute? Oh. You're over, I think. Oh, hold on. If I could just give another, just a couple minutes, just to address the mitigation of damages. Make it very brief, please. I will. The mitigation of damages, the plaintiff argued that it was improper to give it. The reason it was proper to give the mitigation of damages is this woman was told to come back in a year. A letter was sent not only to her, but to her primary care physician for her to come back in a year. The reason it was relevant is if she would have come back in a year, the treatment then would have been the same as the treatment if she would have been diagnosed at the time she was seen by Dr. Hilborn initially. So her failure to come back a year later instead, a year and nine and a half months later, could have caused the tumor to grow in size such that she needed a more radical surgery than what would have been done had she been diagnosed earlier with a reasonable follow-up. The plaintiff said the plaintiff didn't cause her cancer. I agree with that. Dr. Hilborn didn't cause this woman's cancer either. It was her job to exercise reasonable care. And although it's not contributory negligence because we believe she likely had cancer at the time of her ultrasound, it's still incumbent on her to follow the doctor's advice. And the Malinowski case is directly on point, a very similar case, and it basically says that was the right instruction to give. Thank you. Thank you, Mr. Hickey. Mr. Riccolia, rebuttal? Thank you. First of all, let me go back to this PowerPoint because I think it's very important to understand that we received the PowerPoint at no time that included the images. What we received was a discovery answer to a 237 request on the 7th of the day of the trial. Monday of the start of the trial is when we received this particular document that was to answer all of our requests for production, and at no time was there any reference to picking a jury. However, I'd like to go back to that for a minute. What we have here is the opportunity for the defendant, Hilborn, to bring into this record in the presence of this jury five or six radiologists to support his opinion that the images of He compared the PowerPoint images from the textbook with the images from the mammogram and the ultrasound that he had evaluated in 2004. Keep in mind, you're talking to a jury. I get that part. I want to make sure you understand my question. Did he say, or make reference to the fact that he put this image up there? Look, this is from a textbook, and experts agree that what you're seeing up there shows a benign tumor. I don't recall whether or not he said it came from a textbook. He may not have. He may have put those images up there and said, these are images that show cancer, where it says cancer, and I disagree with Mr. Hickey on what the other images showed in terms of describing what it was. There were cancer and non-cancers. And then he would use those and show that this is the image of Mrs. Charbonneau. And as a result, the cancer was not the same on the image as it was in his images. And how any juror could define the distinction between those two, there's just no way they could do it. What they did is they brought in, and the jury was made aware, that this was an evaluation made from a textbook from radiologists. This was an actual mammogram reproduced. So somebody had to read that. That somebody who had to read it was a radiologist who called what that was. By doing that, you added an expert witness, defending Hilburn in this case. If he had six or seven different images, I think he said eight, he had eight different radiologists, potentially, to say that the images of Dr. Hilburn were correct. Because he was using Charbonneau's images, comparing them with the evaluations of the other radiologists in the reproduction of their mammograms in this textbook. In other words, he argued, see here's the plaintiff's images, and they look like these ones over here. Exactly. And if this radiologist said this is not cancer, then this isn't cancer either. They're the same. They look the same. And we had no way of disputing it. I don't know how we could have done anything about that. And also, Your Honor, there is an important distinction between BI-RADS 2 and BI-RADS 3. As a matter of fact, if you read the record, you'll see that Dr. Hilburn said that it was his mentor, he was mentored by the person who invented the categorization of breast malignancies. And it was the American Radiology Society that offered that as a guideline for radiologists. Now, why is that important? It's important because she was entitled to know whether or not she had cancer. When you say probably benign, what would have been the first reaction to someone who's told it's probably benign? Well, what else can you do to find out if it's truly benign? All he had to do was biopsy. He already knew there was a problem. There was a difference in the 2004 mammogram from the one from Texas. That was a red flag for him. That took him out of the category of a screening mammogram, brought him into a diagnostic mammogram. That wasn't good enough. There was abnormalities in that. Did anybody testify that had they biopsied this at the first opportunity that you suggest that that biopsy absolutely would have come back malignant? Not only did he say that, his expert witness said it. His expert witness said that had there been a biopsy on cross-examination, had there been a biopsy of the mass in 2004, in his opinion, that mass would have come back cancerous. And he said, however, that's retrospective. And I said to him, how can it be retrospective? You're basing the fact that if a biopsy was taken on the real records that were there showing the abnormalities, the suspicious abnormalities. You knew there was cancer there in 2004. He admitted that. His expert. If you look in the record and look at the dialogue between the cross-examination, my cross-examination with those experts and Dr. Hilborn, there isn't any way that this case should not be sent back for either a new trial or a judgment in our favor based on Dr. Hilborn's admission that this was not benign. And one other thing. The letter that she got didn't tell her anything other than that your mammograms were benign. It didn't say probably benign. It said benign. And she testified that if she would have been told that it was probably benign, she would have insisted on a biopsy. Because, and I certainly can't argue with her, she said she didn't want to leave there knowing, in her mind, that there was a chance, regardless of what the percentage was. Did the letter tell her to come back in a year? No, the letter said comply with the American Cancer Society rule that says when you're 40 years old, you should have an annual mammogram every year. It didn't even refer to the mammograms that she had. It was a form letter testified to that thousands of those letters go out every year. They're sent by the radiology department of St. Mary's Hospital to people who have had mammograms. It's a form letter signed by Dr. Hilborn. He was, he never wrote her a letter, told her anything about her results. Thank you, Mr. Riccoli. I just want to, Mr. Hickey, you don't have to get up here. You said you emailed the PowerPoint to Mr. Riccoli. Yes. Did it have, the email, did it have images in it or didn't it? It did. So you disagree about it? It's on the record that you have before you. That's part of the post-trial motion record. Ann stated for me that I provided those images to them prior to trial. Except that the email, it did come, and we didn't get it. It was sent to us within the 60 days before the start of that trial. And if it's not a demonstrative evidence, if it's not demonstrative, if it's substantive, which it was, it needs to get to us before that. Otherwise, a 60-day rule makes absolutely no sense. You might as well forget about 213. Okay. Good point. Any other questions? We'd like to thank you both for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel change.